UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LEWIS BELL, SR.,

         Plaintiff,

               9:10-CV-1577
v.                (LEK/TWD)

DR. SOHAIL A. GILLANI, J. THOMAS,
PAUL DAUGHERTY, JASON BEAN,
LYDIA BRENNAN, JOHN DOE,

          Defendants.
_____

APPEARANCES:           OF COUNSEL:

LEWIS BELL, SR., 09-B-3809
Plaintiff pro se
Auburn Correctional Facility
P.O. Box 618
Auburn, NY 13021

HON. ERIC T. SCHNEIDERMAN       BRIAN J. O'DONNELL, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT-RECOMMENDATION and ORDER

    This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn,

Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Plaintiff Lewis Bell, Sr. alleges that Defendants violated his rights by substantially changing his

regimen of psychiatric medications. (Dkt. No. 31.) Plaintiff alleges that the changes in his

medication lead him to attempt suicide. *Id.* Currently pending before the Court is Defendants'

motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 102.)

For the reasons discussed below, I recommend that the Court grant Defendants' motion and enter

judgment in their favor.

## I.    BACKGROUND

### A.    Factual Summary

The second amended complaint (the "operative complaint") alleges that Plaintiff began

psychiatric treatment for post traumatic stress disorder, mood disorder, and major depression

with psychotic episode disorder on March 8, 2005, at St. Mary's Mental Health Psychiatric

Center in Rochester, New York. (Dkt. No. 31 at 6-7.) Plaintiff was treated with psychiatric and

psychotropic medications and therapy in which a baseline medication regimen was established

that minimized his negative symptomology. *Id.* at 7. This regimen included five different drugs:

Seroquel[1], Trazodone[2], Lithium[3], Abilify[4], and Zoloft[5]. *Id.* Plaintiff's drugs and dosages

---

[1]    Seroquel is prescribed for the treatment of schizophrenia and is also used for the short-term treatment of mania associated with bipolar disorder. *The PDR Pocket Guide to Prescription Drugs* 1303 (Bette LaGow, ed., 7th ed. 2005).

[2]    Trazodone is used to treat depression. United States National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth (last visited Aug. 23, 2013).

[3]    Lithium is used to treat and prevent episodes of mania in people with bipolar disorder. United States National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth (last visited Aug. 23, 2013).

[4]    Abilify is used in the treatment of schizophrenia and to help control the manic phase of bipolar disorder. *The PDR Pocket Guide to Prescription Drugs* 1 (Bette LaGow, ed., 7th ed. 2005).

[5]    Zoloft is prescribed for major depression. *The PDR Pocket Guide to Prescription Drugs* 1646 (Bette LaGow, ed., 7th ed. 2005).

remained consistent through August 20, 2008. *Id.* During 2008, Plaintiff was declared mentally disabled by the Social Security Administration. *Id.* at 7-8.

On August 20, 2008, Plaintiff was arrested and incarcerated at the Monroe County Jail. *Id.* at 8. At the jail, Plaintiff's drug regimen continued without change. *Id.*

In the fall of 2009, Plaintiff was convicted and sentenced to a term of incarceration in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"). *Id.* He was transferred to Wende Correctional Facility. *Id.* Immediately upon his arrival, his medication regimen was changed. *Id.* at 8-9. Specifically, Seroquel was stopped entirely and Zyprexa[6] was added. *Id.* at 9. Plaintiff complained to mental health staff, none of whom are named as defendants in this action, that he was suffering adverse effects from the change. *Id.* These adverse effects included insomnia, night terrors, and night sweats. *Id.*

On December 11, 2009, Plaintiff was transferred to Elmira Correctional Facility. (Dkt. No. 102-10 ¶ 3.) At the time of his arrival, his records showed that he had been diagnosed with paranoid schizophrenia, depression, hypertension, diabetes, and migraine headaches. (Dkt. No. 102-8 ¶ 5.) Defendant Jason Bean, a Licensed Master Social Worker 2, met with Plaintiff as soon as he got off the bus at the facility. (Dkt. No. 102-10 ¶ 3.) Defendant Bean is not authorized to prescribe medication. *Id.* ¶ 11. Defendant Bean noted that Plaintiff appeared to be mildly anxious, which Defendant Bean opined was "entirely normal under the circumstances." *Id.* ¶ 7. Plaintiff reported three previous suicide attempts but appeared to have no present thoughts or intent of suicide or harm to himself or others. *Id.* The form that Defendant Bean

---

[6]     Zyprexa helps manage symptoms of schizophrenia, the manic phase of bipolar disorder, and other psychotic disorders. *The PDR Pocket Guide to Prescription Drugs* 1670 (Bette LaGow, ed., 7th ed. 2005).

completed during his assessment contained questions about auditory hallucinations. *Id.* ¶ 8.

Plaintiff did not report any auditory hallucinations and Defendant Bean noted no sign that

Plaintiff was responding to internal stimuli. *Id.*

Defendant Paul Daugherty, a Nurse Practitioner, met with Plaintiff on December 18,

2009. (Dkt. No. 102-8 ¶¶ 1, 4.) Defendant Daugherty obtained a history from Plaintiff, reviewed

the medical records that came with Plaintiff from the county jail, and performed a psychological

assessment. *Id.* ¶ 5. Plaintiff complained of continuing feelings of paranoia and depression. *Id.*

¶ 6. Plaintiff requested that his prescription medications be increased. *Id.* Defendant Daugherty

is authorized to write prescriptions. *Id.* ¶ 7. Defendant Daugherty adjusted Plaintiff's

medications to address Plaintiff's complaints. *Id.* Specifically, he discontinued Lithium and

Benadryl and increased Plaintiff's dosages of Zyprexa, Trazodone, and Zoloft. *Id.* Defendant

Daugherty believed this regimen would be more effective and involve less risk. *Id.*

Defendant Bean conducted a follow-up session with Plaintiff on December 31, 2009.

(Dkt. No. 102-10 ¶ 9.) Defendant Bean observed that Plaintiff "appeared to have essentially

normal functioning, although he reported that he was having a terrible time sleeping, and he

reported hearing 'voices' which he said had increased in intensity and volume." *Id.* At that time,

there was a consensus among Plaintiff's treatment team to extend his housing time on B Block

Extended, "which is an area within the facility that has more frequent rounds by security staff,

was constructed to be safer in terms of preventing hanging attempts and which is generally

significantly quieter than the rest of the facility." *Id.* ¶ 10. Plaintiff reported that the B Block

Extended housing was more comfortable and made him better able to deal with the stressors of

prison life. *Id.*

Defendant Bean did not have any contact with Plaintiff after the December 31, 2009, appointment.  (Dkt. No. 102-10 ¶ 11.)

Plaintiff alleges that on January 16, 2010, he "advised OHM staff" that voices were telling him to hurt himself and others.  (Dkt. No. 31 at 10.)

Plaintiff requested mental health services and was seen by Defendant Lydia Brennan, a Masters Level Psychologist, on January 20, 2010.  (Dkt. No. 31 at 10; Dkt. No. 102-6 ¶¶ 1, 6.) Plaintiff alleges that he told Defendant Brennan about his deteriorating condition, explained the changes that had been made in his medication regimen, and asked that he be returned to the regimen he had received before his transfer into DOCCS custody.  (Dkt. No. 31 at 10-11.) Plaintiff alleges that Defendant Brennan did nothing.  *Id*.  Defendant Brennan declares that Plaintiff reported that the change in his medication had helped with his sleep problems.  (Dkt. No. 102-6 ¶ 6.)  Plaintiff told Defendant Brennan that he was not hearing any voices, but stated that his medication was "wearing off."  *Id*.  He also reported having disturbing nightmares.  *Id*. Defendant Brennan gave Plaintiff information on sleep hygiene and advised him to give the new medication time to work because he had only been taking it for a few days.  *Id*.

Defendant Brennan saw Plaintiff again on January 25, 2010.  (Dkt. No. 102-6 ¶ 8.) Plaintiff reported that "nothing is new."  *Id*.  He reported that he was still depressed and having difficulty sleeping, but that he was not thinking of suicide.  *Id*.  He did not report hearing any voices.  *Id*.

Defendant Brennan saw Plaintiff again on February 17, 2010.  (Dkt. No. 102-6 ¶ 9.) Plaintiff requested Defendant Brennan's assistance in getting his cell moved because he had a conflict with one of the correction officers and had received some misbehavior reports.  *Id*.  At

this meeting, Plaintiff for the first time told Defendant Brennan that he was hearing voices telling him to hurt himself or others. *Id.* Plaintiff stated that he knew he did not have to obey the voices, but that he found them disturbing. *Id.* Defendant Brennan told Plaintiff that his housing location was specifically designed to provide extra supervision and support for inmates with mental health issues and that his cell would not be changed until he demonstrated adequate stability. *Id.*

Defendant Daugherty met with Plaintiff on February 22, 2010. (Dkt. No. 102-8 ¶ 8.) Plaintiff complained of mood swings and an increase in his anxiety level. *Id.* Defendant Daugherty adjusted Plaintiff's medications. *Id.* Specifically, Defendant Daugherty discontinued Zyprexa, which Plaintiff had refused to take, and added Vistaril.[7] *Id.*

Defendant Brennan also met with Plaintiff on February 22, 2010. (Dkt. No. 102-6 ¶ 10.) At that meeting, Plaintiff was still focused on his request to change his housing location. *Id.* Defendant Brennan again told Plaintiff that he needed to demonstrate stability before a cell move would be considered. *Id.* Defendant Brennan told Plaintiff that he was scheduled for a psychiatric evaluation to address his report of auditory hallucinations and irritability. *Id.* They agreed to meet again after that appointment to discuss those issues further. *Id.*

Defendant Brennan next met with Plaintiff on February 25, 2010. (Dkt. No. 102-6 ¶ 11.) Plaintiff told Defendant Brennan that he continued to hear voices but that they had decreased in intensity and frequency. *Id.* He reported that his cell had been moved, which reduced his anxiety and frustration. *Id.* Defendant Brennan noted that it was difficult to assess the accuracy of

---

[7]     Vistaril is an antihistamine used to relieve the symptoms of common anxiety and tension. *The PDR Pocket Guide to Prescription Drugs* 142 (Bette LaGow, ed., 7th ed. 2005).

Plaintiff's report of hearing voices because (1) he only reported the voices after he had received disciplinary sanctions; and (2) he never gave any indication – such as delayed responses, darting glances, and secrecy about symptoms – that he was responding to inner stimuli. *Id*. Plaintiff requested more frequent therapeutic contact. *Id*. Defendant Brennan told Plaintiff that the availability of therapeutic callouts was limited, but that he could be evaluated and assessed in the Residential Crisis Treatment Program if he was experiencing increased mental health symptoms. *Id*. Plaintiff declined that offer. *Id*. The plan continued to be for Plaintiff to receive verbal supportive therapy twice monthly. *Id*.

Defendant Brennan next saw Plaintiff on March 15, 2010. (Dkt. No. 102-6 ¶ 12.) Plaintiff stated that he was frustrated that he had been in the Elmira reception center for so long and asked why he had not been moved. *Id*. He questioned why his prescription for Lithium had been discontinued. *Id*. Defendant Brennan stated that the Lithium had been discontinued four months earlier and asked Plaintiff why it was now an issue. *Id*. Plaintiff stated that his current medication was not working as well as he would like it to, but did not provide any specific details. *Id*. He reported that he was continuing to hear voices but that they were low and were not instructing him to do anything. *Id*. Plaintiff did not exhibit any objective signs that he was responding to internal stimuli. *Id*.

Defendant Brennan's last meeting with Plaintiff was on March 29, 2010. (Dkt. No. 102-6 ¶ 13.) Plaintiff was still focused on the December 2009 discontinuation of his Lithium prescription. *Id*. Plaintiff did not provide any specifics for why the Lithium issue had become important to him. *Id*. At this meeting, Plaintiff "had noticeable movement of his mouth similar to chewing gum." *Id*. Defendant Brennan and Plaintiff discussed the need to schedule a

psychiatric appointment to assess the side effects of Plaintiff's medication. *Id*. Plaintiff reported

that the voices were present but low and that he was not receiving any "command

hallucinations." *Id*. This was Defendant Brennan's final contact with Plaintiff. *Id*.

Defendant Daugherty saw Plaintiff on March 30, 2010. (Dkt. No. 102-8 ¶ 9.) Plaintiff

complained of mood swings and increased anxiety. *Id*. Plaintiff reported a tightness of his jaw

and involuntary movement similar to chewing gum. *Id*. This was a possible side effect of

Plaintiff's Abilify prescription, so Defendant Daugherty prescribed Cogentin[8] to address the side

effect. *Id*. This was Defendant Daugherty's final contact with Plaintiff. *Id*. At no point in any

of his meetings with Defendant Daugherty did Plaintiff report experiencing auditory

hallucinations. *Id*. ¶ 10. Defendant Daugherty never noted any sign that Plaintiff was responding

to internal stimuli. *Id*.

On April 8, 2010, Defendant Brennan prepared a Termination Transfer Progress Note to

be included with Plaintiff's records when he was transferred to a new facility. (Dkt. No. 102-6 ¶

14.) It listed Plaintiff's diagnosis as paranoid schizophrenia, posttraumatic stress disorder,

borderline personality disorder, diabetes, migraine headaches, and hypertension. *Id*. It listed

Plaintiff's medications as Abilify, Cogentin, Zoloft, and Trazodone. *Id*. Plaintiff's treatment

team recommended that he continue to receive services at his new facility. *Id*.

Plaintiff was transferred out of Elmira on April 9, 2010. (Dkt. No. 102-6 ¶ 15.) He

arrived at Clinton Correctional Facility on April 12, 2010. (Dkt. No. 102-5 ¶ 3.)

On April 17, 2010, Plaintiff was seen by Defendant Sohail A. Gillani, M.D., a specialist

---

[8]  Cogentin improves muscle control and reduces stiffness. United States National
Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0000225/ (last visited
Aug. 30, 2013).

in psychiatry licensed to practice in the State of New York and board-certified by the American

Board of Psychiatry and Neurology. (Dkt. No. 102-3 ¶¶ 1, 3.) Defendant Gillani reviewed

Plaintiff's chart and noted that Plaintiff had a record of previous hospitalizations for mental

problems and three previous incidents of self-harm. *Id.* ¶ 4. Plaintiff's chart also indicated that

he had diabetes. *Id.* Plaintiff's chart indicated that he was taking Abilify (15 mg in the morning

and 10 mg at night), Cogentin (1 mg twice per day), Zoloft (200 mg in the morning), and

Trazodone (200 mg at night). *Id.* ¶ 5. Defendant Gillani took a history from Plaintiff. *Id.* ¶ 6.

Plaintiff:

> stated that he was a veteran and had been in combat in Desert Storm.
> He also stated that he heard voices and had been having flashbacks of
> an incident in combat. He was not very specific about the incident
> and was able to discuss it calmly, which is unusual. His description
> of the voices that he heard was also quite unusual. He said that the
> voices were coming from inside his head. Typically psychotic people
> who hear voices think that the voices are coming from somewhere
> outside of their body, and they often look around for the source of the
> voice. [Plaintiff] did not. Also atypically, [Plaintiff]'s voices did not
> appear connected with any sort of delusions. Specifically, there was
> no disorganization in his speech and the content of his thought was
> clear. For example, he was demanding to be admitted to Clinton's
> Intermediate Care Program (ICP) so that he could be in a quiet place
> and get some sleep. The one typical feature of [Plaintiff]'s
> description of the voices was that they were non-continuous.

*Id.* As a result of this first contact with Plaintiff, Defendant Gillani: (1) referred Plaintiff to the

ICP; (2) discontinued Plaintiff's prescription for Trazodone because it "was a secondary

medication" that Plaintiff was using as "a sleep aide," not "primarily for psychosis," that "had

some serious potential side effects" such as priapism[9] and serotonin syndrome;[10] and (3) replaced Plaintiff's Trazodone prescription with Vistaril, another sleep aide not associated with serious side effects. *Id*. ¶ 7. Defendant Gillani explained the reasons for the medication change to Plaintiff. *Id*.

On April 23, 2010, Plaintiff was interviewed by Defendant Jessica M. Thomas, a Licensed Mental Health Counselor. (Dkt. No. 31 at 12; Dkt. No. 102-5 ¶¶ 1, 6.) Defendant Thomas does not have the authority to prescribe medication. (Dkt. No. 102-5 ¶ 20.) Plaintiff alleges that he gave Defendant Thomas his medical history, including his propensity toward self-harm when not properly medicated. (Dkt. No. 31 at 12.) Defendant Thomas declares that she:

> interviewed [Plaintiff] in order to obtain historical information as well as his present concerns. He also began screening for increased programming. During this meeting [Plaintiff]'s report of his symptoms was not consistent with psychosis. Specifically he reported that he heard voices that woke him up at night; but [Plaintiff] did not exhibit any overt signs of internal preoccupation. I encouraged him to elaborate on his symptoms; however he did not do so. Instead he simply used terms such as "psychotic break" or reported that he was schizophrenic. He did state that he was upset that his prescription for Trazodone had been discontinued, because he said that it "stopped the voices." To the best of my knowledge, auditory hallucinations such as hearing voices are not an indication for the use of Trazodone.

(Dkt. No. 102-5 ¶ 6.) Plaintiff reported that he had trauma related to service in the Gulf War, which caused him to sleep only "a couple of hours" each night. *Id*. ¶ 9. Plaintiff did not report flashbacks, hypervigilance, or other trauma-related symptoms. *Id*. Plaintiff stated that he

---

[9]     Priapism is "a persistent and often painful erection of the penis." (Dkt. No. 102-3 ¶ 7.)

[10]     Serotonin syndrome is "characterized by heart palpitations, headaches, nausea, jittery shaking movements of the body and in rare cases death." (Dkt. No. 102-3 ¶ 7.)

engages in self-harming behavior in order to release emotional pain, but without much specific detail. *Id.* ¶ 10.

On May 1, 2010, Plaintiff was interviewed again by Defendant Gillani. (Dkt. No. 31 at 13.) Plaintiff alleges that he told Defendant Gillani that his condition was deteriorating and that he had self-harm issues when not properly medicated. *Id.* Defendant Gillani declares that Plaintiff reiterated that the voices were coming from inside his head. (Dkt. No. 102-3 ¶ 8.) At this interview, Plaintiff initially reported that the voices he heard were continuous, but later in the interview reported that they were non-continuous. *Id.* Plaintiff appeared to have no delusions, no formal thought disorder, no hallucinatory behavior, and appeared calm and relaxed. *Id.*

After the May 1, 2010, appointment, Defendant Gillani reviewed Plaintiff's chart notes from Elmira and discussed Plaintiff with Defendant Thomas. *Id.* Defendant Thomas informed Defendant Gillani that when Plaintiff was "observed on his own in the company of other inmates, he appeared happy, jovial and relaxed, all of which would be atypical of a truly psychotic person." *Id.* ¶ 9. It appeared to both of them that Plaintiff "was reporting atypical symptoms of psychosis which did not correlate with objective observations of his behavior and speech." *Id.* ¶ 8.

After his second appointment with Plaintiff, Defendant Gillani "had a strong doubt . . . that [Plaintiff] suffered from schizophrenic illness." (Dkt. No. 102-3 ¶ 10.) In Defendant Gillani's view, Plaintiff "did not show any clear and typical psychotic symptoms." *Id.* In light of that opinion and the fact that the Food and Drug Administration warns against the use of Abilify in patients with diabetes, Defendant Gillani planned to reduce and discontinue Plaintiff's prescription for that medication. *Id.* Further, because Cogentin had been prescribed merely to

counteract the side effects of Abilify, Defendant Gillani also planned to discontinue it. *Id.* When Defendant Gillani explained his reasoning to Plaintiff, Plaintiff "became argumentative." *Id.*

On May 26, 2010, Plaintiff had an appointment with Defendant Thomas. (Dkt. No. 102-5 ¶ 11.) Plaintiff reiterated that his self-harming behavior was a method of releasing emotional pain. *Id.* He stated that it was not intended to end his life. *Id.* He stated that he had difficulty processing past abuse. *Id.* Plaintiff did not report any psychotic symptoms and did not exhibit any signs of internal preoccupation, such as hesitating as if listening to someone. *Id.* At this session, Defendant Thomas informed Plaintiff that his diagnosis had been changed and that he no longer had a principle diagnosis of psychosis. *Id.* ¶ 12.

On June 5, 2010, Plaintiff saw Defendant Gillani. (Dkt. No. 102-3 ¶ 11.) Plaintiff did not report having auditory hallucinations, despite the discontinuation of his Abilify. *Id.* Defendant Gillani told Plaintiff that his primary diagnosis had been changed to borderline personality disorder and alcohol dependence. *Id.* Plaintiff demanded Trazodone and Abilify and appeared irritable. *Id.* As a result, Defendant Gillani increased Plaintiff's dosage of Zoloft and continued the Vistaril to address Plaintiff's irritable mood. *Id.*

On June 8, 2010, Plaintiff was admitted to the Residential Care Treatment Program at Clinton with complaints of worsening auditory hallucinations. (Dkt. No. 102-3 ¶ 12.) The admitting psychiatrist noted that Plaintiff did not demonstrate any formal thought disorder, delusions, or hallucinatory behavior. *Id.* Plaintiff's speech was clear and organized. *Id.* Defendant Gillani declares that it is notable that Plaintiff's "presentation was no different than while he was taking a high dose of antipsychotic medication" despite being on no antipsychotic medication at all. *Id.* Plaintiff was discharged from the Residential Care Treatment Program

without any changes in medication.  *Id*.

On June 21, 2010, Plaintiff saw Defendant Thomas again.  (Dkt. No. 102-5 ¶ 13.)  Prior to the interview, Defendant Thomas observed Plaintiff in the holding cell.  *Id*.  Plaintiff was in the company of other inmates and appeared calm and relaxed.  *Id*.  However, during the interview, Plaintiff rocked back and forth in his chair, stopping whenever he was frustrated or trying to make a point.  *Id*.  Plaintiff informed Defendant Thomas again that his self-harming behavior was not an attempt to end his life.  *Id*.  Plaintiff blamed a recent disciplinary event on "the voices."  *Id*.  When asked, Plaintiff replied that he knew the voices were not real and became upset when asked why he listened to them if they were not real.  *Id*.  Defendant Thomas declares that Plaintiff's "behavior and presentation continued to be inconsistent with true psychosis."  *Id*.

On June 28, 2010, Plaintiff was admitted to the Residential Care Treatment Program with what Defendants characterize as superficial cuts on his left forearm.  (Dkt. No. 102-3 ¶ 13.)  Plaintiff refers to these cuts as a suicide attempt, and this suicide attempt is at the center of his claims against Defendants.  (Dkt. No. 107 at 1.)  Plaintiff told the admitting psychiatrist that the voices had commanded him to cut himself.  (Dkt. No. 102-3 ¶ 13.)  Defendant Gillani declares that Plaintiff's "complaints of auditory hallucinations were not associated with typical features of hallucinations and he had no formal thought disorder, delusions or hallucinatory behavior."  *Id*.  Plaintiff alleges that he received "inadequate care [and] treatment of his lacerations" and that "he was placed for [three] days in a strip cell for observation[.]"  (Dkt. No. 31 at 13-14.)  Plaintiff alleges that Defendant Gillani did not see Plaintiff for three days.  *Id*. at 14.  Plaintiff further

alleges that "only after Plaintiff agreed Dr. Gillani placed Plaintiff on 500 mgs Depicote[11] and 15 mgs Remeron[12] to start after two weeks." *Id*. Defendant Gillani declares that he prescribed Remeron to address anxiety, irritability, and to prevent further impulses of self-harming behavior. (Dkt. No. 102-3 ¶ 13.)

On June 30, 2013, Plaintiff reported feeling better, stated that he appreciated the medication changes, and did not complain of hearing voices. (Dkt. No. 102-3 ¶ 13.) He was discharged from the Residential Care Treatment Program that day. *Id*.

Defendant Thomas saw Plaintiff on July 7, 2010. (Dkt. No. 102-5 ¶ 14.) By that time there was a consensus in Plaintiff's treatment group that he should be accepted into the Transitional Individual Care Program to receive increased programming. *Id*. Plaintiff reported hearing voices but did not report any distress or concern relating to the symptoms. *Id*. Rather, he said, his distress was related to past abuse. *Id*.

On July 17, 2010, Plaintiff was again admitted to the Residential Care Treatment Program, reporting that he was hearing voices demanding that he kill himself. (Dkt. No. 102-3 ¶ 14.) Plaintiff reported that he heard the voices in his right ear and inside his head. *Id*. Defendant Gillani declares that a typical auditory hallucination would be heard in both ears. *Id*. Plaintiff told Defendant Gillani that he would change his mind about hurting himself if he could stay in the Residential Care Treatment Program over the weekend. *Id*. Plaintiff was clear, without distress, and without any hallucinatory behavior. *Id*.

---

[11] Depakote is used to control the manic episodes that occur in bipolar disorder. *The PDR Pocket Guide to Prescription Drugs* 410 (Bette LaGow, ed., 7th ed. 2005).

[12] Remeron is prescribed for the treatment of major depression. *The PDR Pocket Guide to Prescription Drugs* 1232 (Bette LaGow, ed., 7th ed. 2005).

## B. Procedural History

Plaintiff filed his original complaint in the Western District of New York on December 2, 2010. (Dkt. No. 1.) He filed an amended complaint in the Western District of New York on December 8, 2010. (Dkt. No. 3.) The case was then transferred to this District. (Dkt. No. 4.)

Plaintiff filed the operative complaint on April 8, 2011. (Dkt. No. 31.) Defendants moved to dismiss the operative complaint. (Dkt. No. 47.) The Court granted the motion in part and denied it in part. (Dkt. Nos. 65 and 74.)

As a result of the Court's order on the motion to dismiss, the only cause of action remaining at issue in this case is an Eighth Amendment claim against Defendants Gillani, Thomas, Daugherty, Bean, and Brennan. The Court has previously characterized this claim as raising two different theories: (1) a claim that Defendants failed to provide constitutionally adequate medical care by changing Plaintiff's medication regimen and failing to respond to his complaints about his deteriorating mental condition; and (2) a claim that Defendants failed to protect Plaintiff from self-harm. (Dkt. No. 65 at 5-6.)

Defendants now move for summary judgment. (Dkt. No. 102.) Plaintiff has opposed the motion. (Dkt. No. 107.)

## II. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir.

2006).  Only after the moving party has met this burden is the nonmoving party required to

produce evidence demonstrating that genuine issues of material fact exist.  *Id*. at 273.  The

nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's]

pleading" or "simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986).  Rather, a

dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  In determining whether a genuine issue of material[13] fact exists, the Court must resolve

all ambiguities and draw all reasonable inferences against the moving party.  *Major League

Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

## III.    ANALYSIS

Defendants argue that they are entitled to summary judgment because Plaintiff cannot

prove a constitutional claim for deliberate indifference to a serious medical need.[14]  (Dkt. No.

---

[13]    A fact is "material" only if it would have some effect on the outcome of the suit.
*Anderson*, 477 U.S. at 248.

[14]    Although this Court has previously characterized Plaintiff's complaint as asserting
an Eighth Amendment claim under two different theories (inadequate medical care and failure to
protect), the analysis for those two theories is the same.  While claims involving the risk of
suicide have been articulated and addressed as violations of the duty to protect, particularly when
asserted against non-medical personnel, "[t]he bulk of cases dealing with the right of a person in
custody for protection from suicide analyze the issue as an Eighth Amendment claim dealing
with the inadequate provision of medical care." *Kelsey v. City of New York*, No. 03-CV-5978,
2006 U.S. Dist. LEXIS 91977, at *13 n.5, 2006 WL 3725543, at *4 n.5 (E.D.N.Y. Dec. 18,
2006), *aff'd*, 2009 WL 106374 (2d Cir. 2009). The Court will provide Plaintiff with a copy of this
unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557
F.3d 76 (2d Cir. 2009) (per curiam).

102-16 at 16-22.[15])  Defendants are correct.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments.  The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment.  *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976).  Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Id*. at 102 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).  Thus, the Eighth Amendment imposes on prison officials the duty to "provide humane conditions of confinement" for prisoners.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care.  *Id*. (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

There are two elements to a prisoner's claim that prison officials violated his or her Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference."  *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted).  "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted).

Defendants cursorily argue that "Plaintiff has not come forward with sufficient evidence . . . to establish that he, in fact, suffers from a sufficiently serious condition to meet the [Eighth]

---

[15]     Citations to page numbers in Defendants' memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

Amendment standard." (Dkt. No. 102-16 at 19.)  A "serious medical condition" is "a condition

of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912

F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted), *accord Hathaway v.*

*Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied*, 513 U.S. 1154 (1995); *Chance v.*

*Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Relevant factors to consider when determining

whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the

existence of an injury that a reasonable doctor or patient would find important and worthy of

comment or treatment; (2) the presence of a medical condition that significantly affects an

individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143

F.3d at 702.  As this Court noted in its decision on Defendants' motion to dismiss, although there

are no published cases on the topic in the Second Circuit, the First Circuit has held that

depression combined with anxiety attacks or suicide attempts is a serious medical need. *Mahan*

*v. Plymouth Cnty. House of Corr.*, 64 F.3d 14, 16, 18 (1st Cir. 1995); *Torraco v. Maloney*, 923

F.2d 231, 235 n.4 (1st Cir. 1991).  (Dkt. No. 65 at 12-13.)  Defendants have not provided any

evidence or authority to alter the Court's previous position on this issue.  Therefore, the Court

will assume for the purposes of this motion that Plaintiff suffered from a serious medical need.

Regarding the subjective prong, medical mistreatment rises to the level of deliberate

indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that

evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F.3d at 703

(quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).  Thus, to establish deliberate

indifference, an inmate must prove that (1) a prison medical care provider was aware of facts

from which the inference could be drawn that the inmate had a serious medical need; and (2) the

medical care provider actually drew that inference.  *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702.  The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need.  *Farmer*, 511 U.S. at 835.

Plaintiff has not raised a triable issue of fact regarding deliberate indifference.  It is important to note that inmates do not have a right to choose a specific type of treatment.  *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004).  More specifically, "[d]ifferences in opinion between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's serious medical needs."  *Wright v. Genovese*, 694 F. Supp. 2d 137, 160 (N.D.N.Y. 2010) (punctuation omitted).  Here, Plaintiff has demonstrated, at most, a difference in opinion with his mental health care providers.  In support of the motion for summary judgment, the providers have explained the medical basis for their decisions.  Defendant Brennan, for instance, declares that Plaintiff:

> arrived with a very unusual combination of medications that didn't appear to me to be indicated for his diagnosis or reported history.  His presentation, i.e. the way he looked, spoke and engaged with staff and other inmates, in my view, gave no credence to the symptoms he was reporting.  His behavioral history was very functional for someone allegedly experiencing such extreme psychiatric distress.  Based upon my contact with [Plaintiff], he was offered medications that provided similar results with fewer risks and his symptoms appeared to increase or decrease depending upon his disciplinary/housing situation much more than his medication regime.

(Dkt. No. 102-6 ¶¶ 4-5.)

Defendant Gillani declares that never in his interactions with Plaintiff did Plaintiff "present with typical psychotic symptoms, nor did he appear to be in any distress because of the symptoms that he did report.  He was noted to get irritable and angry only when he met with

frustrations regarding not getting the medication . . . that he demanded." (Dkt. No. 102-3 ¶ 15.) Defendant Gillani declares that he discontinued Plaintiff's prescriptions for Abilify, Cogentin, and Trazodone because "to a reasonable degree of medical certainty, I considered that prescribing the medication . . . would be more likely to cause harm than benefit, and the fact that [Plaintiff] had reported no benefit on a high dose of antipsychotic medication as well as on one occasion reported no auditory hallucination symptoms while being on no antipsychotics." (Dkt. No. 102-3 ¶ 16.) In Defendant Gillani's opinion, the June 28, 2010, incident was Plaintiff's attempt "to obtain the medically contraindicated medications which he had taken immediately prior to his incarceration." (Dkt. No. 102-3 ¶ 18.)

As this Court noted in its decision on Defendants' motion to dismiss (Dkt. No. 65 at 14), "determinations of medical providers concerning the care and safety of patients are given a presumption of correctness." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001). Plaintiff was given an opportunity to develop the record in this case to raise a triable issue that, as he alleged, "Defendants' decisions regarding his medication were based 'on factors unrelated to prisoners['] medical needs[,] namely [the] cost of medication and contracts related to procur[e]ment of medications . . . .'" (Dkt. No. 65 at 15, citing Dkt. No. 31 at 21.) Plaintiff has not met that burden. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and enter judgment in their favor.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 102) be **GRANTED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Kelsey v. City of New York*,

No. 03-CV-5978, 2006 U.S. Dist. LEXIS 91977, 2006 WL 3725543 (E.D.N.Y. Dec.18, 2006).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: August 30, 2013
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge